May it please the court, counsel. My name is Bruce J. Douglas. I'm here today along with my co-counsel, Arden Page, and we represent the defendants, Pool Company, Planning Administrator, Pool Medical Plan, and other named defendants. It's a privilege to be with the court today, and this is my first appearance before the Ninth Circuit. I welcome this opportunity. Very briefly, Your Honor, this is an appeal for the judgment in favor of the plaintiff who was a participant in the MRSA welfare plan. The plan administrator, exercising discretionary authority delegated to him by the written plan document, denied medical benefits to the plaintiff, who suffered injuries while riding his snow machine at speeds in excess of 100 miles an hour at night with a blood alcohol concentration in excess of 0.0%. Can they go that fast? Apparently they can't. Boy. The plan administrator invoked the intoxication exclusion in the plan document. This report covers a conflict of interest under the rule of Atwood v. Longold that the circuit applied a de novo standard of review and reversed the decision of the plan administrator. In this case, we seek a reversal of the judgment and a rendering of the judgment in favor of the defendants, or alternatively, remand the district court for the application of the arbitrary and capricious proper standard of review. In this case, Your Honor, recognizing the court is familiar with the facts and has read the briefs, I have two primary points I'd like to raise this morning, this afternoon, for discussion. The first is as follows. The written plan contains an unambiguous grant of discretionary authority as contemplated by the U.S. Supreme Court's decision in Firestone v. Bruck. The plan administrator's denial of benefits in this case finds support in the record and is reasonable and should have been affirmed under the arbitrary and capricious standard of review. Second, the plaintiff did not establish by material probative evidence in accordance with Atwood a serious conflict of interest to warrant application of the de novo standard of review, and in any case, Atwood's burden-shifting scheme is inconsistent with the statute, the Firestone rule, and to submit the Supreme Court's recent decision in Norwood v. Black & Becker. There is a different point. You mentioned that arbitrary and capricious as the alternative standard is not of use of discretion. I think the cases in this circuit, Your Honor, have tended to equate the phraseology of use of discretion with arbitrary and capricious. I believe in this circuit the precedents hold that they are synonymous. Okay. And then the other question. The Supreme Court decision you just referred to in Norwood. Yes. Came when? The Norwood decision came down, I believe, in May of this year, Your Honor. It was issued by the Supreme Court May 27. But doesn't that really relate to deference to, you know, the treating medical physician in the context of a risk-averse of Social Security? So I'm not quite sure how that affects our Carney case or the standard of review case. I'd be happy to point that out, Your Honor. As Judge McFeely has correctly noted, the Norwood v. Black & Becker case rejected the circuit's approach to the imposition or the importation of the treating physician rule from Social Security disability cases to ERISA cases. What is significant, though, in that case, there is language which I think bears on this particular case. At page 10 of the Supreme Court's split opinion, the court says as follows. Planned administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But we hold courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician. And this is the pertinent part of the court's opinion. It doesn't have anything to do with a conflict of interest allegation. No, it did not. Although that was briefed in the Norwood case, the Supreme Court did not address it. But the pertinent part that I would like to bring to the court's attention is the last part of the sentence of the Supreme Court's opinion. Nor may courts impose on planned administrators a discreet burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation. Now, of course, the North case arrives in the context of this circuit's decisions in the Regula and the North case and so forth, and rejected the treating physician rule. But if you substitute the burden-shifting scheme in Atwood for the treating physician rule and insert that in the Supreme Court's language, I think that there is a very significant point here, though the Supreme Court did not specifically address Atwood or mention it, that there is certainly a question of whether the burden-shifting scheme in Atwood is consistent with the statute and is consistent with the Firestone decision. I just want to ask you something, because if we take your point as argued, we would have to restructure our whole law. And Atwood was after Firestone, and I don't think our panel has that ability. In other words, it might be warranted or it might be interesting, but we don't really have that ability. I understand that, Your Honor. We raised the point about Atwood because we do believe very strongly that the burden-shifting scheme established in Atwood is inconsistent. But it is not necessary for this court, and I certainly agree with you, Judge McHugh, on the panel. This panel certainly cannot overrule another panel decision. It's something for the full court, perhaps, to think about for the future. But it is not necessary to overrule Atwood to find in favor of the plan administrator here. It would be sufficient for this court to find that there was no basis under the Atwood decision to impose the de novo standard of review and to strip the plan administrator of the deference that he is due under the terms of the plan. As we have pointed out in briefs, there really is nothing here in the record to support the change of the standard of review. The plan administrator, in this case, gave a very careful, deliberate consideration to the claim for benefits. There is no treating physician rule is not involved here. There is no conflict among the experts, the two toxicologists. They both agreed what the blood alcohol concentration of the plaintiff was at or about the time of the accident. So all we really have here to justify the change of the standard of review is the plaintiff's assertion that there is a conflict of interest. And the only conflict of interest that arises in this case is the inherent conflict of interest that is present in every self-funded ERISA welfare plan. The things that Mr. Judge seemed to mention were sort of uncertainty about what is intoxication and not having sort of a standard about that and then also not conducting any investigation or making any findings or any rulings or anything on whether the intoxication had anything to do causally with the accident. Those are some of the points raised by the plaintiff and the district court referred to them. Let me address those points. In the first place, the term intoxication is not defined in the plan. However, the district court found that the term intoxication was not ambiguous. The plan itself gives the authority to interpret and to construe its terms to the plan administrator. And as this court has said in the past, that when there are terms in the plan to be defined, it is the role of the plan administrator. And even though a court might define the term differently or might interpret the plan differently, so long as the interpretation of the plan administrator is reasonable, it must stand. With respect to the lack of an investigation, respectfully, Your Honor, I submit that that is simply not the way ERISA welfare plans in their administration work. It is not the function of the plan administrator to go out into the field to conduct an investigation. It is the responsibility of plan participants and beneficiaries to submit information to the plan administrator upon which a decision can be made. And although the plaintiff would have this court believe that the lack of an on-site investigation to determine the cause of the accident is somehow significant, in reality it is not. The cause of the accident isn't really the issue. The question before the plan administrator was, in light of the fact that the accident or the incident occurred, can it reasonably be said that the plaintiff's blood alcohol concentration was a contributing factor? And I think it was reasonable at .08 for the plan administrator to reach that conclusion. That's fundamentally what the plaintiff is complaining about, that the plan administrator relied upon a .08 blood alcohol reading to deny the claim. I mean, but if he'd been on a snowmobile and the .08 alcohol had been hit by lightning, would you deny the claim? No. Well, then there must be some causation requirement in addition to the level of blood alcohol. I submit that is correct, Your Honor, and the plan administrator looked at that, and in light of what he knows about the accident, what the documentation, what the reports indicated, it's simply in the statements made by the plaintiff that he was operating the machine at speeds in excess of 100 miles an hour at night on unfamiliar terrain or terrain that had changed, as he claims in his papers. I think the plan administrator made a very reasonable conclusion that at .08 he was not sufficiently in control of his machine or that his reaction times were slow to the point where the level of blood alcohol concentration affected his ability to operate the machine, and therefore that level of intoxication contributed to the injury. So the standard then is not caused but contributed to? The standard in the medical plan, yes, Your Honor. I mean, excuse me, under the plan document. Under the medical plan, the standard is a contributing factor. Under the non-ERISA STD plan, the policy, it does refer to the words proximate cause. Okay, so what do we do with that? Because those are two different things. Well, Your Honor, it's a difficult question. If the court were to conclude that the decision of the plan administrator under the medical plan was sound and it should be upheld, one would think that the same result should apply to the STD plan. But there is that difference in language, and conceivably there could be different results under the two plans. Okay. I mean, because it does seem to me that you could say, given this configuration of what was there at the end of this road, this unexpected obstruction, that alcohol could be a contributing factor because if you were not that intoxicated, one reasonable person might have been able to slow down. But whether it actually was the proximate cause given the history, I'm not sure you could say that in the document. I tend to agree. On the issue of the STD plan, it's a more difficult argument because of the language in the policy which says proximate cause, but in the medical plan, the language is a contributing factor. Okay, thank you. If there are no further questions, I would be happy to reserve the remainder of my time. Thank you. Thank you. Good afternoon. I'm Mike Flanagan. I represent the plan of Mr. Stewart in this case. Mr. Stewart was an employee of the pool, Arctic Alaska Company, which was a subsidiary of a larger company pool. They had a plan where the employees contributed money for medical benefits, but that money did not go into any kind of a fund. The employer simply kept the money. They then paid the benefits out of their own pocket. So there was no connection between the benefits and the contributions. So the company stood to benefit any time they denied a claim. It is, and this circuit is held that a private insurer, just like an employer plan, creates an apparent conflict of interest right off the bat. But this case goes farther than that. These facts show you that it isn't just the fact that the plan administrator is an employee of the company, but there's actually a financial benefit for the denial of the claims. Plus, when we took Mr. Dupree's deposition, he admitted he's the plan administrator, that he was on a bonus plan based on the profitability of the company, and that therefore denying claims puts money in his pocket as well. So there's a big conflict of interest that was factually not just apparent in this case. So that was the background by which we asked for a denial of review. And we pointed out to the court, and under the circuit's rulings in Atwood and the cases that followed, it isn't just simply enough to point that out. We have to show that the administrator's decisions appear to be tainted by the conflict, that the administrator appears to be acting from the conflict. The conflict is driving these actions. We had to prove that. We did prove that. We went and took the depositions of the administrator and his assistant, and we asked them straight out why they were making decisions they weren't. What they told us was that they based the decision in this case entirely on the VA report, the toxicology report. That's it. Their decision was entirely based on that. So the questions about toxic cause, contributing factors, that gentleman has nothing to say about these particular facts. He just simply says this was the VAI calculator.  It was there because that toxicologist had picked up what one of the doctors erroneously had written down at the accident time, which was at 8.30 p.m. During the ministry process, Mr. Stewart and I are aware, he got the ambulance reports, the AST dispatch reports, and the hospital reports, and he showed conclusively that the accident happened at 10 o'clock because that's when the call-out is, that's when the report of the accident is, and that's when he arrives at the emergency room, and that's the time it's written at the emergency room as well. He conclusively established that that was an error. When that was pointed out to the plan administrator, what happened was instead of saying, oh, I'm sorry, we made an error, they changed the definition. Instead of using intoxication, now they're using impairment, and that theme follows all the way through the case, that they used the word impairment, and in fact, in the last letter denying the last appeal, they not only used the word impairment, but they tied it to the company's employment policy, which doesn't allow anything higher than a .04 at work, so in their interpretation of the language, they didn't just interpret the language. They changed it. Do you think impairment's a different or a lower standard than intoxication? I do. Impairment means any effect at all. Intoxication means to the average person that the impairment has reached a certain level that you can't drive. That's why in virtually every state we have laws that can be called intoxication or impairment, but they require a certain level of proof. It's not enough to take one drink and drive. That's not against the law. What's against the law is to become incapable of reasonably operating the vehicle, and in Alaska at the time it was .1. In Texas, where the company was at, it was .1. In fact, we asked the plant administrator if the police had arrived, and they investigated, and they decided not to ticket Mr. Stewart. They decided he was not intoxicated under a statute. What would have been the result? They said we would have granted the claim. We wouldn't have done that. What about common sense meanings of the word, for example, and for criminal prosecution, of course, intoxication takes on a special meaning. A lot of times you'll see a police report, for example, you know, arrested a suspect during a dispute between the husband and the wife. The husband appeared intoxicated. Well, they don't necessarily mean that they were intoxicated to the level they couldn't drive, but intoxicated has kind of a common sense meaning, doesn't it? It's separate from the legal criminal definition. Well, do you use that? I doubt the policeman would have put that down if the only evidence of intoxication was the smell of beer on a person's breath. And the trial judge in this case said this much. He said there's two ways of improving the intoxication. One is the beer. That's generally accepted. The other is you've got to show by their symptoms. Generally recognized. Bloodshot eyes. Slurring speech. Difficulty to handle. All these things that we associate with somebody that's drunk. That's what intoxication means to the average person. There's no definition in this plan of what that word means. So, the judge applied this circuit's rulings that we use the ordinary sense of the word. We don't make something up. And the ordinary sense of that word means somebody's impaired to a level that they can't basically operate. And the submission to the administrator regarding the speech, appearance, locomotion of Mr. Stewart was what? Mr. Stewart submitted a statement of his own saying I had a few beers. I worked on the vehicle. I had dinner. I went out driving. I wasn't drunk. His wife said the same thing in a statement she submitted to the company. Then three witnesses, three eyewitnesses that were present at his house and on the trip submitted statements saying the same thing. So, there was five witnesses that said he wasn't drunk or intoxicated at the time of the accident. And the judge said that although the evidence could be diluted because, you know, they're all in the same group, the company, the pool company in this regard had nothing. They had nothing. They had nothing to show anything to the contrary. And so, it wasn't enough for a pool just to doubt these statements. They had to have something of their own. They didn't have nothing. And they hired an investigator on this case right from the very beginning, Crawford and Company. They're the ones that got the medical records to send to the toxicologist. So, the fire ministry didn't have to get out of his seat. He had somebody on the ground in Alaska that he could have used to gather information. He didn't do it. Now, one of the things the pool people did is they criticized these statements as being unsworn. Actually, one of the statements says, I swear this is the truth. But they're not notarized and they don't stand for a perjury. But pool never asked for anything like that. They just said to submit whatever evidence you got. They did. But going back to my point about the review standards, we gathered the evidence. We submitted it to the magistrate at the U.S. District Court's request. The magistrate held specifically long decisions that they had engaged in conflict-tainted decisions. Number one, in the short-term disability benefits, it says local management will make the decision. It's clear. It's undisputed. There's no way to construe otherwise. Local management had approved Mr. Stewart for short-term disability benefits. The plan administrator, who's also the personnel director back in Houston, overruled local management, contrary to the terms of that plan. Secondly, he found that they had engaged in conflict-driven, tainted decision by changing the definition from intoxicated to impaired. He found that they had done the same thing by not gathering any evidence on the approximate cause and yet saying that they made a decision on it. And also, he found that the fact that they overruled the short-term disability benefits without even telling Mr. Stewart what they were doing, that local management had approved his claim but they decided to overrule it. They didn't tell him that. That wasn't disclosed at any time. Actually, we found that out during litigation of this case. So, those fact findings by magistrate, which were adopted by the district court, those can't be overruled on review unless they're clearly erroneous. There's just no basis for deciding they're clearly erroneous because they're clearly supported by the record. And that gets us to the final point on the conflict issue, which is under the Ninth Circuit Regimen, under APLA and the cases that follow it. If there is, even if there's discretion given in the plan, if there's an apparent conflict of interest and the plan has submitted sufficient evidence to show that the conflict is causing a conflict-tainted decision, then the noble review is granted unless the plan administrator can prove, can rebut that evidence, can rebut the evidence of a conflict-tainted decision. They didn't submit any evidence of it. They didn't even attempt to rebut it. And that's in the magistrate's decision. They didn't submit anything. They didn't have any reason for what they did. And so what we've got is, under Ninth Circuit rule, we're entitled to a general review. And the judge carefully considered all the evidence in this case, the U.S. District Judge, and he decided, among many other things, that there simply wasn't any grounds for denying this person's claim, that they hadn't proved he was intoxicated. They could either do it through DA or through evidence. They hadn't done it on either time. And the main point that my Honorable Appointment pointed out at the beginning of the speech, it's inconsiderate of the judge in the slightest because, as he noted, that people routinely travel at high speeds across Big Lake in Alaska, which is a very huge lake that freezes three foot thick in the wintertime. It's covered with snow and people race normally through there. So we ask, Your Honors, to uphold the decision in this case on the medical plan. The decision of the court is well supported all the way from the beginning to the end. And on the STD, I would point out only that it's really a contract claim because Poole and the court, Poole stated it's not an illicit claim, it's a payroll practice. The court adopted that. We didn't appeal that. So it's a contract claim. And the court decided the contract claim adverse to Poole, making findings of law as to what it provided. It specifically provided that local management decided the STD decision. We had the affidavit and the deposition of Mr. Otto, the local supervisor. He testified, I approve these benefits. There wasn't any question what had happened. He was entitled to the benefits because local management had approved them. And then the judge went on to say that even if for some reason that language wasn't enforceable, the same thing applied that applied to the medical plan, that they hadn't proven an exclusion under the plan for intoxication. Of course, the parties have elaborated on what they think the district court's standard of review of the administrator was. What's our standard for reviewing the district court's decision? Your standard of review under the Ninth Circuit precedent is on questions of law, including the standard of review adopted by the court. But on the fact findings that have to be made under this circuit's decisions, in order to begin a de novo review, you've got to find that the decision was conflict-tainted. Those fact findings are reviewed on a clearly erroneous standard. So you have to find, in order to reverse the court on the de novo decision, you've got to find that either given the facts the court found, we still weren't entitled to a de novo review as a matter of law, or you have to find that he was clearly erroneous on the underlying facts that he based his decision on. And your authority for that proposition is? If it's in your brief, it's in the review section. I'll get it from there. Okay. Thank you very much. Thank you. Thank you, Your Honor. I would like to address a couple of points that counsel just raised. First, on the issue of the company standing to benefit by the denial of claims, this argument was made to the Third Circuit in the Firestone case. It was rejected by the Supreme Court. Although a number of the circuit courts, including, I believe, this circuit, would hold that in insurance company cases, there is some reason to believe that the denial of claims by an insurance company necessarily results in more money in their pocket, this court has not applied that same test to self-funded, self-administered plants under ERISA. There is in the record, by the way, information regarding the funding of the plan. In the summary plan description, which is in the excerpt of the record, the SPD advises the employees that they must share in the cost of providing their own medical coverage. And the simple fact is, Your Honor, is that companies like Pool Company and others establish these types of plans as an employee benefit plan so that it can help them attract and retain qualified employees. No employer sets up a plan like this with the idea that it's merely going to be a lose-or-be-benefit plan that no one collects under, because if that were the case, employees would leave their employers in droves. The other point is, Your Honor, is that each year a company like Pool Company creates a budget for this plan. And it's not necessarily the case that if there's bad experience under the plan in one year that the company bears the entire loss. For example, if a company sets a budget in January for how much money, let's say $5 million or $10 million to pay for medical benefits, if that is exceeded by the end of the year, the result in the following year can be one of a number of things. A re-tailoring of the plan to exclude certain types of benefits or a shifting of that cost to the employees through payroll deduction for their share of the benefits. So it doesn't necessarily mean that a penny saved is a penny earned for Pool Company. What it can mean is that a good experience under the plan benefits all of the plan participants and beneficiaries, and that is a fact that this Court has recognized is an effective answer to an assertion of a conflict of interest under AdWords. The other point that I would mention that there is some question here about the error that was made by the toxicologist, Dr. Comstock, in his original report to Pool Company. Yes, he did rely upon the evidence that he had at the time, which was the hospital reports, and the hospital report stated that the accident occurred at 20.30 or 8.30 p.m. That may or may not have been a typo. But that little problem was compounded later on by the submissions of Mr. Stewart and his counsel, Mr. Davies. There is also material in the record, which I can cite pages if you'd like, but there are letters from Mr. Stewart, his wife, and his witnesses who say that the accident occurred around 11 o'clock. It was actually his attorney, Mr. Davies, who said emphatically in his submissions on appeal to the plan administrator that the accident occurred at 10.30 p.m., and that was the time that was ultimately used. I would point out to the court that whether the accident occurred at 10 o'clock, 9.30, or 10.30 really makes very little difference in terms of blood alcohol reading. In fact, the earlier in the evening that the accident would have occurred is detrimental to Mr. Stewart's position because his blood alcohol reading would be higher earlier in the evening and lower later in the evening. So 10.30 was a good range, and it was, in fact, the time that Mr. Stewart's attorney told the plan administrator that the accident occurred. The other issue that I would like to address, and that is, again, the whole issue of the conflict of interest. In reality, the only conflict that plaintiffs assert is the fact that this plan is self-funded and was administered by a pool company. There is no procedural irregularity. In fact, when it was called to the attention of the plan administrator that the original toxicologist report by Dr. Comstock used the wrong time, they sent the whole thing back to Dr. Comstock so he could recalculate it. And then, as it turned out, both Mr. Stewart's toxicologist and the plan administrator's toxicologist agreed within just hundreds of a percentage of what the blood alcohol reading would be. So there really isn't a conflict. There's no dispute among the experts on that. Now, as to the standard of review, as good as it can be, as great as it has, I think that there is some confusion in the court's cases as to whether or not the clearly erroneous standard applies to the factual determinations in a trial and a record. There is language in this court's opinion in Walker v. American Home that suggests that the review by this court of the entire matter must be de novo. There is some other language in other cases suggesting that perhaps the selection of the standard of review is reviewed de novo, but the factual determinations by the district court on a trial and a record are under the clearly erroneous standard. We suggest that the standard of review in this court for a trial on the administrative record conducted in accordance with Kearney must be de novo. Essentially, although there is some different sentiment, I believe, in the opinions of the circuit, that the trial on the record is something more than summary judgment, in reality it is an extended summary judgment proceeding. And the summary judgment review, of course, by this court is de novo. If the court adopts as the standard, the clearly erroneous standard, then what we're going to be left with is that in these kinds of cases, if a conflict is found, then the entire matter is transferred to the district court and those decisions will be virtually unreviewable. I don't think that's what's contemplated under ERISA, and it certainly is not what's contemplated in the written plan document in this case, which gave the authority to the plan administrator to make these decisions and to interpret and construe the terms of the plan. There's nothing further. Thank you. Thank you. Appreciate the argument from both sides. Very good. We'll take the final matter for the day. Thank you. Thank you. Okay. You're Pepper Hamilton? My name is Steven Truitt. I am at Pepper Hamilton, yes. Oh, Steven Truitt. Okay. I represent the city of St. Paul, which is in this valley on the Pribilof Island. It's known as St. Paul Island. It is the civil government for the entire population there, residents, without respect to race or creed. I'm accompanied here by Charles Carpenter and Ron Baird. Charles Carpenter is with me in Washington. Ron Baird is on the phone here in Anchorage. Before identifying the parties further, I would like to foreshadow the points I will discuss, the meetings at and the effect of the restraints on alienation in the settlement agreement. I went to yesterday's conference and I read Mr. Anderson's interesting account, and I decided that I would limit myself to the arguments, although I'm prepared to discuss any of them, I hope. In addition to the fight at St. Paul, there are federal official defendants. They are essentially stakeholders here. They have administrative duties with respect to the islands, and they hold land, which is at the heart of this dispute. The other defendant is Taragusic, which is called for short TDX. It is an absent village corporation for St. Paul Island, whose shareholders reside both on and off the island. It is a for-profit company organized under the laws of Alaska. The central dispute here is on the validity of a settlement agreement, which is a contract. This agreement has profoundly affected the city, which now has zero land and will never get free land if the settlement agreement is upheld. If the agreement is valid, the city will stagnate. The economy of the island will stagnate as the backyard of a monopolist, a land monopoly which can make no case flush. Ninety percent of the operating system market counts as a monopoly. Generally, 99 percent and more of the land on St. Paul Island is owned by or tied up by TDX under this agreement. In fact, I understand that a filling station came into discussion earlier, and you cannot even open a filling station on St. Paul Island if the city decided it was a good idea to do so, because it has no land to do it or to lease it to encourage somebody to come there. TDX must agree. The adoption of the agreement is for procedurally and substantively. Procedure is important here because the rights that are being protected are substantively important. The Order of Appeal found the settlement agreement to be valid and enforceable, thereby making the city liable for its breach. At the same time, it rejected the city's defenses to enforcement of the settlement agreement. The key rulings are all set out in the Order of Appeal. Basically, the city's complaint for a declaration of its defenses to enforcement of the settlement agreement was held to be time-barred. However, in the same ruling, the judge said, but of course these defenses can be raised to an enforcement of the action, and of course there was a counterclaim for enforcement. The city's defenses to the counterclaim for enforcement, both specific performance and damages, rest upon the Open Meetings Act of Alaska, the city's own conflict ordinance, and that the agreement violated the terms of ANCSA and Alaska with respect to constraints on alienation on lands for the city. And finally, that some deterrents of the settlement agreement are unpossible. I think I will now go to what the deal was, what the settlement agreement did. First, in relation to an earlier agreement called the Transfer of Property Agreement, TOPA. In 1987, land selections had not been complete on the island, and they still are not, but NOAA took the position that it wanted to know, it wanted to have agreement amongst the parties that were the players on the island as to who got what. The Transfer of Property Agreement, which was mandated by a congressional statute at the time, did this, and it was a pre-conveyance agreement as to certain 14c3 lands. TDX, the city, the United States itself, and other island entities were there. The main facilities under this agreement, which were used by the city, various buildings, fuel tanks, and what not, were to go to the city. The settlement agreement, in place of that, said, no, you don't get these facilities, we'll run them through you for a long pause for ten years, then they come back to us. This, of course, meant that those facilities would have to be replaced. New facilities that the city would have to find had a cost of $2.7 billion. That's in 1988 dollars. The fuel storage tanks, which were part of the facilities that drove the settler to go to the city, they went to the city as planned, but the city had to pay cash for them. The settlement agreement in relation to ANSYS section 14, the 1,280 acres that municipalities already get under ANSYS, was wiped out by the settlement agreement. Gone forever. A one-time entitlement for municipalities to maintain a base of independence, to be able to promote economic development, and do the same cities do. Gone forever. In place of that, 326 acres in various plots around the island, which could be used by the city, but would revert immediately to Tanagusis upon any commercial use. This, again, means that the city is disabled from doing the normal economic development plans that cities and governments throughout the United States history have done. That's like the Union Pacific, the Great Northern Railways. Cities all over the country which have benefited from the economic development which has been made possible through encouragement of governments like this. There were pending litigation that was also settled. One was a small suit, which involved basically money. There was about a $100,000 difference. The second suit that was settled was called the Calio suit. This was a suit that was brought by TDX because it felt under TOPA, this prior agreement, it was supposed to get every possible bit of lead that had any commercial potential at all on the island. It brought a lawsuit to do that. And if you compare the prayer for relief in that action with what actually happened in the settlement agreement, you will find that they got everything, except for the settlement, excuse me, the suit did not involve the 1,280 acres because it couldn't. I would now like to turn briefly to the Open Meetings Act, which is the central basis on which we say ordinance adopting this agreement is invalid. Is there any objection to the standing of the city of the Open Meetings Act as a defense of the peace? Yes, it was noted by the court below, but he didn't cite it. Now, recall, Your Honor, we are defending a suit brought by Panagousis to enforce an agreement that we say is void. Right. That really, I think, disposes of... If you were saying somebody else's equal protection was being violated, we might say, well, it has to be yours. You can't rely on somebody else's rights. If we viewed the open meeting law as a right of others to have access to city meetings rather than the city's right, the same problem might arise. Well, he would still be enforcing a void agreement if he did that, and the Supreme Court of Alaska has made very clear that the wholesome intent of this act was to avoid exactly that. It provides the remedy for a violation, and that is voidness. It makes no distinction in the act as to when or how that defense or that was to be raised. The purpose is, quite simply, that actions and deliberations of governmental units are to be conducted openly, and that the people delegating their authority do not give their public servants the right to decide what is good for them, for the people to know and what is not good for them to know. Now, what you have before you here was a series of negotiations which were conducted in private and in secret, in fact, by a subcommittee out of the council, and that is the situation which the Supreme Court of Alaska dealt with very specifically in the Brookwood case. The Brookwood case does away with, in our view, every argument that has been raised here. In that case, the meeting was between a quorum of the legislative council and a developer about a rezoning matter. At this meeting, there was negotiation. There was back and forth. There was conversation, and the negotiations that went on was an interchange with questions and answers, a conversation concerning the issues of density, drainage and buffer zones. In fact, in the course of this, a demand was made by some council members that the density be dropped, and in fact, ultimately, it was dropped. Now, I stress the fact that this was a negotiating and fact-finding session because the reason Judge Holland did not apply the Open Meeting Act was he concluded that the Supreme Court of Alaska would create an exception to the Open Meetings Act for negotiating sessions. Now, of course, we have one here. He didn't conclude that. He looked to the Alaska Attorney General. Did he not? The words I used are almost a direct quote from his opinion. He concluded that the Supreme Court of Alaska would create an exception to the Open Meetings Act. Now, his reasoning was based upon the Attorney General of Alaska's opinion. That opinion did not discuss Brookwood. No, but Brookwood is a 1989, or excuse me, what year is Brookwood? It's 85, and the Alaska Attorney General's opinion looks at cases subsequent to that. Well, none of them overruled Brookwood or in care of the homeless. But Brookwood isn't this situation either. Well, perhaps you could enlighten me as to why it isn't because I see it as being very close. Because basically here you've got three or four big public meetings that go through and put this whole thing out on the table. I guess your position is that every negotiation, every shot and kill has to be in public. Is that the city's position? The city's position is that. And is that the position the city will want to take in every subsequent meeting? Well, the city could go into executive sanction if it chose to, perhaps, to conduct this, or it could conduct it through agents. But when the council itself is doing it, it must be public. That's correct. Now, you referred to the subsequent meetings. The judge below found that the meetings in Anchorage were not properly noticed. They were part of the substantive process of deliberation, and he was surely correct in that. The point you were touching upon is, well, there were these later meetings. Didn't they cure it? Now, you didn't use the word cure. I didn't say cure, and, you know, I'm not arguing with you. I'm not an advocate here. I'm asking you a question. Okay. What I thought must lie behind the question is, did these subsequent meetings cure what had gone on? And the answer is, under Brookwood, again, if you don't admit there's a problem, then you can't take the cure. In other words, the precondition for cure is a frank recognition that what has gone on before did not meet the standard of the statute, and that never happened here. And, indeed, you will hear later on that this was precisely the position that the TDX takes today. Now, briefly to the non-commercial restraints. We have stated in our brief, cited the restatement, which makes absolutely clear that the restrictive covenants here which apply perpetually to every single bit of money the government will ever get, the city will ever get, are a naked restraint of trade. The reverter is complete. It gives TANF BUSICs utter control over every acre of land in a remote island hundreds of miles away from anything, and TDX is the only source of land. The inevitable effect of this is that there is no possible way in which the government of the city can have any rational, balanced, competitive economy on that island. I get that question. There is rights of way for public use, for example. Those are reserved, correct? Well, the city was supposed to get under TOEFL a rights of way for the lands it was to get under TOEFL. It never got those either. The city does have some rights of way, but that's a right of way. It's not the simple absolute. There is no relation to the 1,280 acres that were given up for in exchange for, in effect, the 326 acres of limited title. So to understand your point, then, is you feel that because the city can't develop a commercial base, that that's what underlies the public policy concern here? Yes. Develop an economic base. Not its own economic base. Encourage a diverse economy in a place which does not presently have one. And the question is whether this is a company town where there will be a single enterprise, or whether other entrants, small and large, can find a place through governmental encouragement the way it's done everywhere else, all over Alaska, or not. That's my conclusion. That's what I'm going to make. Thank you very much. Thank you, Mr. Court Counsel. I'm Doug Strandberg, representing TANCBC Corporation. Although I didn't attend last night's seminar, I realize that it is an important thing to focus on sad issues. You know, they used to have a judge down in Los Angeles that would tell you how to try your case and then lose it for you. Panagusic is the alien word for our land. In this case, it was about Panagusic's land. Panagusic's land that it was entitled to under two federal statutes. One is the Alaskan Equal Employment Act, and the other is the First Seal Act Amendments of 1983. The district court found that in order to develop the economic potential of this land, that it was at a standstill in 1987 because of competing claims between the city and TDX. One of those competing claims alluded to by counsel was a claim as to, under the Transfer of Property Agreement, what should be the reconveyance obligations of TDX to the city. That particular Transfer of Property Agreement, which implemented the First Seal Act Amendments of 1983, gave TDX basically almost all of the commercially valuable land on St. Paul Island, and it did so because that act's specific purpose was to create a private enterprise economy not dependent on stealing. The arguments that counsel is making today are arguments that should have been made to the federal government 20 years ago. What Congress did, and what the federal government implemented through COPA, was to convey land to TDX for its commercial development. The reconveyance obligation, that is the linchpin of their argument, that reconveyance obligation said that we will reconvey land necessary for municipal purposes, but not having the potential for commercial development. That's in COPA. COPA is not before the court. It's a fully enforceable agreement. So, when we talk about the commercial-noncommercial dichotomy, that dichotomy was created because Congress was looking for private enterprise economy, and they chose TDX as being the vehicle or the economic engine. Are you quoting from the statute when you're saying that's suitable for commercial? I'm quoting from paragraph 5 of COPA. But the legislative history, which is cited at length in Judge Holland's opinion, basically says that as far as the development of the lands on St. Paul Island, that they are to be developed, and this particular set of lands is to create a private enterprise economy, not dependent on ceiling. So, that's one body of land that is before the court, and that's one body of land. That was part of the settlement agreement. And the parties did a major compromise with regard to that. That says that they were entitled to all the buildings. Well, that wasn't true. Federal government didn't say they were entitled to the building. What they said is, do you negotiate with TDX as to your entitlement? And that's exactly what the parties did. Now, counsel said, well, we didn't get anything. All we got were visas. Well, that's not true either. The fuel tanks were not entitled. The city was not entitled to the fuel tanks. TDX was entitled to the fuel tanks. As part of the settlement, they transferred their interest to the city. The city was not entitled to a distribution, fuel distribution easement, from land that TDX provided for them to put the fuel tanks on, to bring the fuel to their dock for the commercial signal fuel. They weren't entitled to that. That's a commercial operation, but they got that. They say that TDX got everything it wanted in the Calais lawsuit. Of course it didn't get everything it wanted. It specifically asked, as it recorded in the Calais lawsuit, that it didn't have to convey land to the city for their commercial fuel operation. But they conceded that. And they conceded a lot more. In that particular, in the resolution of the Calais lawsuit, we also said cities should be limited as far as their TIDELANDS application, because they said that they would promote our TIDELANDS application so we could develop our land. But instead, we withdrew our TIDELANDS application. They were able to get TIDELANDS there that we had sought, and was before an administrative body for resolution. We withdrew our TIDELANDS application. They take the settlement agreement, they go to DNR, and they get the TIDELANDS, the commercially valuable TIDELANDS, which now allows them to bring up a floating processor. They have a right to an easement for an outfall line across TDX land, commercial operation. They set up their floating processor. They have a commercial outfall line. And they rent out their dock space. The very idea that they're prevented from doing anything in a commercial sense just doesn't support it on the record. Offering up to the TIDELANDS door, are we just talking about the TIDELANDS high in the water, or are we talking about high in the water? No, actually, the TIDELANDS there are extremely valuable because it allowed them to build another dock. There was a disputed TIDELANDS area that had been filled in. They got a portion of that, and we got a portion of that. How far out did they go? I'm just curious. It's a mean high water mark, but actually, because of some filled TIDELANDS in the area, what we had to do as part of the settlement agreement is we resolved who would get that in DNR and granted a portion of that. So, for example, and why it's so critical in this case and why the city is trying to upset this particular settlement is we took our settlement agreement lands, and we leased them out to a land-based processor, who built that processor's facilities both on TIDELANDS, on TOPA lands that are the one segment of land, and a portion of it on lands under the Plains Act that we're entitled to. That shows the complexity of the land situation that existed and why our efforts to improve the land were totally at a standstill, as the district court said. And why this agreement allowed us to go forward, and we went for it for eight years. We removed this big cloud over TDX's head. We were allowed to go forward and develop. For eight years, the city got all the benefits under the act. Now, the city says it doesn't have title to anything. The reason the city doesn't have title to anything is they refused, during the pendency of this litigation, to accept title. The district court specifically found that. And how we found that is that they had sued us for breach of contract for not conveying title. And the court said, wait a minute, how can TDX breach a contract when you're not going to let them perform? Are we talking about the title to the 326 acres now? The title to the 326 acres, also the title... Yes, it would be just the 326 acres, because that is the only property that we have title to, but it's not 326 acres. We've elaborated in our briefs as to why that's a totally false figure. We actually have committed to the city, state of Alaska, public health service, school district, lands far in excess of that. Now, in their reply brief, they say, well, you can't count 740 acre watershed use, but we're not going to count that at all, because we don't have access to it. That's not true. And their record is the affidavit of Ron Filimonoff. I think it starts at supplemental record at about 96. And in fact, they've gone on to this land, they've drilled at least four wells, the distribution system, they've put in roads, and to top it off, they've now zoned that entire area open space, meaning virtually that we have no opportunity to develop that particular land. In fact, they've zoned 85 to 90% of the island as open space, virtually precluding our development of that land. I'd like to briefly touch on one other issue. And that is the issue as to whether or not you should even proceed and consider open meetings, conflicts, other issues that are raised by the city, because the city has not appealed that portion of the district court's judgment that found that all of the claims of invalidity of the settlement agreement are barred by the statute of limitations. It is our contention that that fine bar of invalidity also bars their affirmative defenses to our validity action because of mirror images of each other. Let me explain how there are mirror images. For example, the court found there's a statute of limitations with regard to the Open Meetings Act. In other words, any action taken at an open meeting, they had a very liberal six-year statute of limitations in which to attack that action. They didn't do it. They waited eight years, more than eight years. The court ruled that it was time bar. Well, the time bar works on the remedy. What's the remedy under the Open Meetings Act? The remedy would be to void an action under the Open Meetings Act if it had not been cured and if it was in the public interest. That remedy is gone. So how can they go back under the guise of taking the very same claim? Mirror image, absolute same claim. And now say, well, we can still void the action because this is now TVX's enforcement of a validity action. Enforcement. Therefore, we can release that same remedy that was time bar. So under the particular facts of this case, we suggest to the court that that simply cannot be done. We think that because there is a judgment that is now binding on this court, a judgment that is binding on the district court, that these claims are time bar, they're entitled to preclusion. What if I can understand an argument that the time bar ought to apply to defense? I guess I will dispute that. Right. I'm not sure I understand an argument that it somehow leads to that. I mean, this is all still part of the same lawsuit. It is all part of the same lawsuit, and I would agree, and that's why in our briefs we talked about also the law of the case. The reason why, and this court as well as the Supreme Court has talked about these as being analogous doctrines. The reason why I think that it applies in this particular case or should be by analogy applied by this panel, is that take, for example, the city is holding over in four properties that they said they would give up to TEX at the end of 10 years. Ten years have gone by, they're holding over, and they say, well, we're holding over because the settlement agreement is not valid. Now, this holdover occurs during the course of this litigation. We go off to state court, and we sue them for damages for their holdover. These lands are supposed to return to us, and they haven't returned to us. Okay. And they defend on exactly the same basis that they're defending today. They say, well, you're trying to enforce the settlement agreement, but you can't enforce the settlement agreement because it violates the open meeting clause. We'll say no. DiNardo versus Behrens. State court will now look at this judgment that has already been entered on their dismissal, and they will say, we will give it full preclusive effect, because that's what the Ninth Circuit does. The Ninth Circuit has said that the dismissal of statute of limitations grounds is a dismissal on the Behrens. The state court in an enforcement action that we would take in state court under this very same settlement agreement would in fact find that there is no merit to their defenses. So if you go forward and rule with regard to the merits, so to speak, of their affirmative defenses, the danger is that you're going to create an inherently inconsistent result. Right now, we can take that judgment. It's not jurisdictional. The statute of limitations issue isn't jurisdictional. So if we were to say, even assuming you can bring defenses and say nothing about the affirmative judgment that's been entered, that wouldn't in any way conflict with the judgment you already have.  If we sued in state court to enforce a settlement agreement, that judgment, because it's on the merits, preserves for us the right to say that they did not timely bring an Open Medians Act claim. It allows us to do that. And then we can cite that judgment and say, based on the judgment of dismissal on the statute of limitations grounds, that is, in fact, the merits determination. State court will look at federal court, and they'll look at the cases that we cited, like Siddig versus Flecktone and those cases, and they'll say, yes, that's a merits determination. Therefore, to avoid this particular statute of limitations problem, it's an analogy. You're absolutely right, Judge Canby, that we're still somewhat in the same case, but we've got a judgment that is not subject to further review by this court or by the district court. That is the dismissal on statute of limitations. Would you address briefly this issue under the Open Medians Act of the Brookwood case, which does have some very specific language in there that virtually anything, any meeting, any informal session, is a public meeting? I will. Brookwood arose when there was an ordinance that was scheduled to be heard. And a week before that, a quorum met. And they had discussions with regard to the very ordinance that was under consideration. And that case is so different from this case because, first of all, there was seven days of public meetings that took place on St. Paul Isle. Now, the alleged violation of the Open Meetings Act by the city, the city's own allegations around this conduct, was one meeting in Anchorage that took place eight months before the final consideration. And the court said, yeah, the notice for that meeting was inadequate. We, of course, have raised the issue, well, it may have been inadequate for some of the citizens, but it wasn't inadequate for the city of St. Paul. They attended the meeting. They're the ones responsible with regard to that. So the other reason why Brookwood doesn't apply in this particular case is the reason why the district court said it doesn't apply. And that is, what we have is a lawsuit that's pending. And under the attorney general's opinion, that lawsuit is pending. And there's nothing wrong with people getting together and negotiating as far as that lawsuit is concerned because where the Open Meetings Act comes in and where it focuses in is after the parties have come to some sort of tentative settlement, then the attorney general's opinion says the time for attachment to the Open Meetings Act is at that point where there's something to consider. Up until the time that TDX made an offer to settle on December 21, 1987, there wasn't anything for the council to consider. There was no pending ordinance as there was in Brookwood. There was nothing for them to consider. At those negotiating sessions, were each side represented by attorneys or was this a direct negotiation? All negotiation sessions were conducted by attorneys, not only just attorneys attending, but the attorneys actually conducted the negotiation sessions. The city attorney was present at all negotiation sessions. We have elaborated in brief as to the doctrine of cure. Judge Holland didn't get to the doctrine of cure at all because he found no violation. But we've cited numerous cases that, contrary to their suggestion about Brookwood, doesn't require a city council to come up and say, via culpa, via culpa. That's not a requirement of Brookwood. It's not a requirement of any other jurisdiction that is considered cure. Substantial reconsideration of the issue. We presented uncontroverted evidence that after the meeting in Anchorage, three weeks later, there was a three-day meeting, publicly held, public came in, and they went through all provisions of the proposed settlement agreement. That's on the record. So if there was a violation and the city has standing to claim a violation with regard to the main meeting, it certainly was cured under any standard applied by the Supreme Court in ACC and AP. We'll have to read these carefully because you're probably familiar with the case in Washington where an alleged whisperer of the Kansas City Council members was also found to be a violation of the exact attorney general there suggested it might be. So we'll take a close look at that case. One other case that I think you should take a close look at, in fact there's two of them if I could just add, is the Ramsey case. Because I think Ramsey really resolves all the issues as far as what occurred. Ramsey basically said that if there's a notice violation, actual notice cures. I would submit that Ramsey in fact should be a controlling case in this particular case. All right. Thank you. I agree with counsel that you should read Ramsey fairly closely because you will find it does not stand for the propositions cited for just now. While it was said that there was a single negotiating session that was in Anchorage, we now have heard that there were multiple ones later on. And of course there were multiple ones and that's confirmed by the affidavit of Phyllis Swenson which is in the record. Now, Judge Holland summed it up, this question of the use of defenses as time limits and statute of limitations are a shield, not a sword. They operate, they have no statute of limitations defenses do. Now it is true there was a declaration saying you are not entitled, the city, to bring an action for declaratory judgment to have your defenses declared as effective, which is what we saw. Now, let's suppose, and that judgment, that's final for sure, but it also said that the defenses you have can be raised and were raised. Now they never appealed for the order saying that. They've appealed for no order. We have appealed for the order which said both things. They cannot embrace and at the same time avoid what the judge said. Now, they raised a hypothetical case, and it is hypothetical, about well, suppose we try to recover our property in Anchorage in a lawsuit someplace. Well, there's no reason to think that the Alaska court will come to any different conclusion than Judge Holland did, which is the statute of limitations operates as a sword, as it were, a shield, not a shield, and that it could be interposed there as well as here. So there is no risk of inconsistency that we see. The only meaning I can ascribe to the notion of preclusion here is that for sure a judgment on the statute of limitations is a judgment on the merits. And if we were able to find a place that had a 20-year statute of limitations, we could not bring the same action that we had brought here to seek a declaratory judgment because all of our defenses would have been declared, or rather all of our entitlements of that relief would have been tied up in the judgment which said your time barred for seeking declaratory relief. All right. A note about the watershed. Fair easements, less than fee. We point this out in our brief. The refusal to accept the tender of performance. We were concerned about ratification. The long and the short here is the state has no possible way to have a balanced or promote a balanced economy, not by entering into business itself, but by encouraging others to do small businesses, large businesses, or whatever. The government ought to be able to do that. Alas, the law says it can do that, and it can't over TDA. All right. Thank you. And that will be it. And this court will now recess until call. All rise.
judges: Pregerson, Canby, McKeown